UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSERVATION CONGRESS, a nonprofit organization,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES FOREST SERVICE; UNITED STATES FISH AND WILDLIFE SERVICE,<br><br>Defendants. | No. 2:13-cv-01922-TLN-CMK<br><br>**ORDER** |

This matter is before the Court pursuant to Plaintiff Conservation Congress's ("Plaintiff") Motion to Supplement the Administrative Record. (ECF No. 43.) Defendants United States Forest Service ("Forest Service") and United States Fish and Wildlife Service ("FWS") oppose the motion. (ECF No. 45.) For the reasons discussed below, Plaintiff's motion is DENIED.[1]

**I.   BACKGROUND**

In the underlying complaint, Plaintiff challenges a decision by the Forest Service to approve the Bagley timber sale. (Compl. ¶¶1, 2, ECF No. 1.) The Bagley timber sale is an operation to remove fire-damaged trees in a portion of the Shasta-Trinity National Forest. (Compl. ¶¶13–21, ECF No. 1.) Plaintiff alleges the timber sale will have a negative impact on the Northern Spotted Owl. (Compl. ¶¶ 31–36, ECF No. 1.) The Northern Spotted Owl is a

---

[1] "A court that orders an administrative agency to supplement the record of its decision is a rare bird." *The Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*, 667 F. Supp. 2d 111, 112 (D.D.C. 2009).

threatened species, and Plaintiff alleges that some of the area that will be affected by the Bagley timber sale is the owl's critical habitat. (Compl. ¶¶ 31–36, ECF No. 1.) Plaintiff contends that the Forest Service, with concurrence from FWS, approved the timber sale in violation of several federal environmental laws. (Compl. ¶ 2, ECF No. 1.) The Court notes that Plaintiff's present disagreement is much narrower in scope.

In 2011, FWS published a guidance document known as the *2011 Protocol for Surveying Proposed Management Activities That May Impact Northern Spotted Owls*, which the parties and the Court refer to as the 2011 Survey Protocol. The 2011 Survey Protocol provides a "methodology that ensures a high probability of locating spotted owls that may be affected by proposed management actions." (Mem. from Assistant Reg'l Dir., Ecological Services, US Fish and Wildlife Serv. Concerning the 2011 Northern Spotted Owl Survey Protocol (Feb. 7, 2011), Am. Ex. A, ECF No. 44.) In considering whether to authorize the Bagley timber sale, neither the Forest Service nor FWS conducted any surveys themselves. (Biological Assessment for: Bagley Hazard Tree Abatement Project ("Biological Assessment), FWS-BAR-40, ECF No. 38.)[2] The agencies do not contest this point. (Defs.' Opp'n ("Opp'n") 4:27–5:4, ECF No. 45.) Instead, the agencies relied upon third-party surveys that were "based on the 2011 [S]urvey [P]rotocol." (Biological Assessment, FWS-BAR-40, ECF No. 38.)

Each agency submitted its administrative record to the Court earlier in this lawsuit. The Forest Service's record is docketed at ECF No. 32, while FWS's record is docketed at ECF No. 38. Neither submitted record contains the 2011 Survey Protocol, a fact the parties do not dispute. Plaintiff believes that omission is erroneous and has moved the Court to supplement the records. (Pl.'s Mot. to Suppl. ("Mot.") 2:21–3:14, 9:23–10:2, ECF No. 43.)

**II.    DISCUSSION**

Judicial review of an agency action is generally limited to review of the record on which the administrative decision was based. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S.

---

[2]    Plaintiff cites to the Forest Service Bagley Administrative Record (ECF No. 32) as FS-BAR-[Bates page number] and to the FWS Bagley Administrative Record (ECF No. 38) as FWS-BAR-[Bates page number]. (Mot. 2:25, ECF No. 43.) Defendants follow the same convention. (Defs.' Opp'n ("Opp'n") 5:3, ECF No. 45.) The Court follows suit.

2

402, 419–20 (1971).  It is the agency's responsibility to compile the administrative record and present it to the court.  *See Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985) ("The task of the reviewing court is to apply the appropriate [Administrative Procedure Act] standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court.").

In rare cases, a court can look to documents or materials that the agency itself has not presented as the administrative record.  These rare cases typically fall into two categories.  First, courts are sometimes asked to consider extra-record evidence—information that the agency did not consider when it made its decision.  *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996).  Second, courts are sometimes asked to consider evidence that the agency allegedly considered when it made its decision, but which was not included in the administrative record the agency submitted to the court.  *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989).  The instant case is the latter; Plaintiff asks the Court to complete the record rather than look beyond it.

The Administrative Procedure Act directs a court reviewing an agency action to review "the whole record."  5 U.S.C. § 706.  But the whole administrative record "is not necessarily those documents the *agency* has compiled and submitted as 'the' administrative record."  *Thompson*, 885 F.2d at 555 (emphasis in original).  The whole administrative record "consists of all documents and materials directly or indirectly considered by agency decision-makers[,]" even if those documents are contrary to the agency's position.  *Id.* (original emphasis omitted).  The foregoing principle creates some tension with the presumption of regularity.  When an agency compiles and submits the administrative record to a court, the agency enjoys a presumption that it included the whole record.  *E.g.*, *Pinnacle Armor, Inc. v. United States*, 923 F. Supp. 2d 1226, 1232 (E.D. Cal. 2013).  The court presumes the agency properly defined and compiled the administrative record absent "concrete evidence" that the agency omitted documents or materials that it actually considered when making its decision.  *Id.* at 1239 (quoting *Sara Lee Corp. v. Am. Bakers Ass'n*, 252 F.R.D. 31, 34 (D.D.C.2008)).

It is Plaintiff's burden to produce that "concrete evidence" and rebut the presumption of

regularity. "For a court to supplement the record, the moving party must rebut the presumption of administrative regularity and show that the documents to be included were before the agency" when it made its decision. *Pac. Shores Subdivision, California Water Dist. v. U.S. Army Corps of Engineers*, 448 F. Supp. 2d 1, 6 (D.D.C. 2006). In the instant case, Plaintiff cannot succeed simply by showing that the agencies were aware of the 2011 Survey Protocol or had the protocol somewhere in their possession. Instead, Plaintiff "must identify reasonable, non-speculative grounds for its belief that the documents were considered by the [agencies] and not included in the record." *Pinnacle Armor*, 923 F. Supp. 2d at 1239 (quoting *Sara Lee*, 252 F.R.D. at 34).

Plaintiff argues that the 2011 Survey Protocol is a part of the whole record because the agencies considered it, directly or indirectly.[3] (Mot. 6:18–20, ECF No. 43.) Specifically, Plaintiff argues that the agencies must have considered the 2011 Survey Protocol because they relied upon third-party surveys that were based on the protocol. (Mot. 7:1–8:16, ECF No. 43.) Plaintiff directs the Court's attention to a portion of the Biological Assessment, which states:

> The earliest survey record within the analysis area was from 1987. Much of the analysis area was surveyed in the 1990s and many of the owl activity centers originated from those survey efforts. Few surveys were conducted during 2000s, but surveys of much of the analysis area were conducted in 2011 and 2012. . . .
>
> *Surveys conducted during 2011 and 2012 were conducted by adjacent private landowners before the Bagley Fire and the purpose was to determine spotted owl occupancy on the private lands in the checkerboard ownership.* Consequently, the surveys overlap only a portion of the Analysis Area, yet are helpful to inform the effects analysis. Based on recent surveys, a portion of the area is occupied, a portion unoccupied, and a portion remains unsurveyed.
>
> *The surveys were based on the 2011 survey protocol* and used a three visit methodology, except in areas where barred owls were detected which received six visits.

(Mot. 7:17–8:7 (quoting Biological Assessment, FWS-BAR-40, ECF No. 38) (emphasis in

---

[3] Plaintiff also argues that the agencies *should* have considered the 2011 Survey Protocol, and that not considering the protocol may have been arbitrary and capricious. (Mot. 6:20–25, ECF No. 43.) Regardless of whether that argument has merit, it is not relevant to the question before the Court on this motion to supplement the record. As Plaintiff itself recognizes "[t]he only issue before the Court on Plaintiff's motion is whether the Defendants considered the [2011 Survey Protocol], either directly or indirectly." (Pl.'s Reply ("Reply") 1:24–26, ECF No. 46.) Accordingly, the Court does not address Plaintiff's "should-have-considered argument" in deciding this motion.

4

Plaintiff's motion).)  Plaintiff's argument is built on an inference.  According to Plaintiff, "Defendants would have had to have, at the very least, *considered* the 2011 Survey Protocol, whether directly or indirectly, to determine that the private surveys were, in fact, 'based on the 2011 [S]urvey [P]rotocol.'"  (Reply 2:8–10, ECF No. 46 (emphasis in original).)  Plaintiff's inference has a commonsense appeal, but it cannot "overcome the strong presumption that [the agencies] properly designated the administrative record."  *Cape Hatteras*, 667 F. Supp. 2d at 114.  For example, Plaintiff's inference overlooks the possibility that the agencies simply accepted that the third-party surveys were based on the 2011 Survey Protocol because the third-party surveys themselves said so.  Another possibility is that the third-party surveys obviated the need to consider the Protocol separately.  Plaintiff's inference cannot eliminate the possibility that the agencies truly did not consider the 2011 Survey Protocol.

*Cape Hatteras* provides an instructive comparison.  In *Cape Hatteras*, FWS designated five coastal areas as critical habitat for the piping plover, a small shorebird classified as threatened in the eastern United States.  *Cape Hatteras*, 667 F.Supp. 2d at 112–13.  A citizen group challenged the critical habitat designation.  *Id.*  Part of the litigation involved whether the court would consider a report that related to the conservation of piping plovers, called the *Biological Opinion for Cape Hatteras National Seashore's Interim Protected Species Management Strategy* ("the BiOp").  *Id.* at 113.  Like Plaintiff here, the *Cape Hatteras* plaintiffs argued that the BiOp was a part of the whole administrative record, even though FWS had not designated it as such.  *Id.*  In *Cape Hatteras*, the National Park Service (not FWS) used the BiOp to develop a management strategy known as the *Cape Hatteras National Seashore's Interim Protected Species Management Strategy* (the *Interim Strategy*).  *Id.*  FWS then used the *Interim Strategy* when it decided to designate the five contested coastal areas as critical habitat for the piping plover.  *Id.*  Other documents in the administrative record also made reference to the BiOp.  *Id.* at 114.  Based on those references and the close connection between the BiOp and the *Interim Strategy*, the *Cape Hatteras* plaintiffs argued FWS actually considered the BiOp when it made the critical habitat designation.  *Id.* at 113–14.

The court disagreed for several reasons.  First, it noted that the mere fact the BiOp was

heavily relied upon in preparing the *Interim Strategy* did not mean that the agency actually considered the BiOp when it made its decision. *Cape Hatteras*, 667 F. Supp. 2d at 114. Second, it reasoned that references to the BiOp in other documents in the administrative record did not prove that the agency considered the BiOp when it made its decision. *Id.* Finally, the court said, "the fact that some comments received during the critical habitat designation process mentioned the BiOp, does not mean that the BiOp itself was considered by FWS." *Id.* The court concluded that plaintiffs had not introduced any concrete evidence that the BiOp was before the agency, so plaintiffs had not rebutted the presumption of regularity. *Id.* The court denied the motion to supplement. *Id.*

The instant case and *Cape Hatteras* are very similar. This case, like *Cape Hatteras*, involves an administrative record that prominently references a document the agencies say they did not consider. And this case, like *Cape Hatteras*, involves a plaintiff relying on inferences and common sense to argue that the agencies actually did consider the referenced document. However, Plaintiff must rebut the presumption of regularity with "concrete evidence" that the agencies considered the 2011 Survey Protocol. *Pinnacle Armor*, 923 F.Supp.2d at 1239 (quoting *Sara Lee*, 252 F.R.D. at 34). Plaintiff's inference cannot carry that burden, so the Court must presume the agencies correctly compiled and designated the administrative record. *Id.*

### III. CONCLUSION

Plaintiff has failed to show through concrete evidence that the agencies considered the 2011 Survey Protocol, directly or indirectly, when deciding whether to approve the Bagley timber sale. Because Plaintiff has not rebutted the presumption that the agencies properly compiled and designated the administrative record, Plaintiff's Motion to Supplement the Administrative Record is DENIED.

Dated: October 11, 2016

Troy L. Nunley
United States District Judge