UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSERVATION CONGRESS, a nonprofit organization,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES FOREST SERVICE; UNITED STATES FISH AND WILDLIFE SERVICE,<br><br>Defendants. | No. 2:13-cv-01922-TLN-CMK<br><br>**ORDER** |

This matter is before the Court pursuant to a motion for a temporary restraining order and/or preliminary injunction filed by Plaintiff Conservation Congress ("Plaintiff"). (ECF No. 50.) Defendants United States Forest Service ("Forest Service") and United States Fish and Wildlife Service ("FWS") oppose the motion. (ECF No. 56.)

The instant case involves a forestry project, the Bagley Hazard Tree Abatement Project ("Bagley Project") following a large fire in the Shasta-Trinity National Forest. In the underlying complaint, Plaintiff alleges that Defendants unlawfully approved the Bagley Project in violation of several federal environmental laws. (Compl. ¶¶ 1, 2, ECF No. 1.) Felling operations associated with a small subset of the Bagley Project began on October 19, 2016. Plaintiff seeks a temporary restraining order and/or preliminary injunction to halt some of the felling. (Pl.'s Mot.

1

for TRO and/or Prelim. Inj. ("Mot.") 1–2, ECF No. 50-2.) The Court has carefully considered the arguments the parties set forth in their briefing. For the reasons discussed below, Plaintiff's motion (ECF No. 50) is DENIED.

I. FACTUAL BACKGROUND

In August 2012, lightning strikes ignited a forest fire in the Shasta-Trinity National Forest that came to be known as the "Bagley Fire" (hereinafter "Bagley Fire"). (Environmental Assessment: Bagley Hazard Tree Abatement Project ("EA"), FS-BAR-30, ECF No. 32.)[1] The Bagley Fire eventually burned over 46,000 acres of public and private land in Shasta County, roughly 70% of which is located in the Shasta Lake and McCloud Ranger Districts of the National Forest. (EA, FS-BAR-30, ECF No. 32.) The remaining 30% of the fire area is private land. (EA, FS-BAR-30, ECF No. 32.) Private land in the fire area is interspersed throughout the public lands, and the fire area resembles a checkerboard of public and private ownership. (*See* EA, FS-BAR-32, ECF No. 32.) The fire burned more severely in some places than others and it left behind a patchwork arrangement of burn severities—a "mosaic of fire-killed and defective trees" spread across the landscape. (EA, FS-BAR-30, ECF No. 32; Hamilton Decl. ¶5, ECF No. 57.)

Ninety-five miles of National Forest System (NFS) roads, open to the public, crisscross the fire area. (EA, FS-BAR-30, ECF No. 32.) The NFS roads within the fire area are classified as Operation Maintenance Level 2 and Level 3, which means the Forest Service maintains the roads for access by high-clearance vehicles and standard passenger cars, respectively. (EA, FS-BAR-24, ECF No. 32; Malone Decl. Ex. 7, at 19–39, ECF No. 52-7.) Like the rest of the fire area, the areas around the NFS roads burned at varying levels of severity. (EA, FS-BAR-30, ECF No. 32.) These roadside areas now have a mosaic of fire-killed and defective trees comparable to the fire area at large. (EA, FS-BAR-30, ECF No. 32.) In some places, the roadside damage is limited to intermittent fire-killed trees. In others, high-severity fire damage and dead trees sprawl across acre after acre. (EA, FS-BAR-30, ECF No. 32.) Some of these burned roadside trees have

---

[1] The Court cites the Forest Service Bagley Administrative Record (ECF No. 32) as FS-BAR-[Bates page number] and the FWS Bagley Administrative Record (ECF No. 38) as FWS-BAR-[Bates page number].

become hazard trees.  (EA, FS-BAR-24, ECF No. 32.)  According to the *Hazard Tree Guidelines for Forest Service Facilities and Roads in the Pacific Southwest Region*, hazard trees are:

> dead or dying trees, dead parts of live trees, or unstable live trees (due to structural defects or other factors) that are within striking distance of people or property (a target). Hazard trees have the potential to cause property damage, personal injury or fatality in the event of a failure.

(EA, FS-BAR-228, ECF No. 32.)

In the name of public safety, the Forest Service closed almost all of the NFS roads in the fire area immediately after the Bagley Fire.[2]  The closure order is still in place, and has been continuously since the fire.  *Id.*  (*See also* Hamilton Decl. ¶ 8, ECF No. 57.)  Nevertheless, the affected NFS roads are traveled with some frequency.  Many state and federal employees—Forest Service personnel, firefighters, and the like—must use the roads to perform their jobs.  (Hamilton Decl. ¶ 9, ECF No. 57.)  In addition, the NFS roads are burdened by easements allowing private landowners to access their inholdings within the fire area.  (Hamilton Decl. ¶ 9, ECF No. 57.)  These users are all exempted from the closure order, *see* FS Bagley Closure Order, *supra*, and must all rely on the roads in spite of the ongoing presence of hazard trees.

The Bagley Project was designed to mitigate the risks associated with those hazard trees. As originally planned, the Bagley Project would do three things:

> • Along 95 miles of open NFS roads, identify and fell hazard trees that have lost their structural integrity and are likely to fall uncontrolled, jeopardizing public safety and the transportation system (5,430 acres).
>
> • Salvage higher concentrations of felled trees along 19 segmented miles of NFS roads (776 acres).
>
> • Treat activity-created fuels in excess of 10 tons per acre (woody material less than or equal to 9-inches in diameter).

(EA, FS-BAR-38, ECF No. 32 (footnotes omitted).)  According to the Forest Service, the Bagley Project would serve three purposes.  First, the project would remove hazard trees and retain open, safe NFS roads for management and recreational uses.  (Decision Notice and Finding of No

---

[2]   FS Closure Order 14-12-02, Shasta-Trinity National Forest Bagley Fire Emergency Closure (U.S.D.A. 2012), http://www.fs.usda.gov/detailfull/stnf/alerts-notices/?cid=stelprdb5443633&width=full ("FS Bagley Closure Order").

3

Significant Impact: Bagley Hazard Tree Abatement Project ("DN/FONSI"), FS-BAR-3, ECF No. 32.) Second, the project would allow the Forest Service to meet its legal and contractual obligations to share NFS road maintenance and repair costs with private users.[3] (DN/FONSI, FS-BAR-03, ECF No. 32.) Third, the project would allow the Forest Service to recover the monetary value of the wood through salvage and sale, offsetting the cost to the public. (DN/FONSI, FS-BAR-04, ECF No. 32.)

In the spring of 2013, the Forest Service began the regulatory approval process for the Bagley Project, as required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq*. The Forest Service prepared a preliminary Environmental Assessment to comply with NEPA, and also went through informal consultation with FWS to analyze the effect the Bagley Project would have on species protected by the ESA. (DN/FONSI, FS-BAR-5–6, ECF No. 32.) On August 29, 2013, the Forest Service issued a final Environmental Assessment and a Finding of No Significant Impact, concluding the approval process. (EA, FS-BAR-20–253, ECF No. 32; DN/FONSI, FS-BAR-2–19, ECF No. 32.) The Bagley Project was approved the same day. (DN/FONSI, FS-BAR-4, ECF No. 32.)

But the Bagley Project was not implemented after it was approved. The Forest Service initially attempted to find contractors who would bid for the right to harvest the salvage timber from the hazard trees. (Hamilton Decl. ¶ 10, ECF No. 57.) Despite several rounds of advertising, the Forest Service received no bids, and no timber felling or salvage logging occurred. (Hamilton Decl. ¶ 10, ECF No. 57.) In fact, it appears highly unlikely that salvage logging will ever occur. "Because the quality of fire-killed trees depreciates rapidly following a fire, it is no longer possible to obtain commercial value from any of the fire-killed hazard trees." (Hamilton Decl. ¶ 10, ECF No. 57.)

In the summer of 2016, the Forest Service, still concerned about the hazard trees and attendant road closures, decided to try again. The Forest Service solicited bids to pay a contractor

---

[3] Pursuant to agreements it entered under the Forest Roads and Trails Act of 1964, 15 U.S.C. §§ 532 *et seq.*, the Forest Service shares with private landowners the maintenance and repair costs for over 40 miles of roads in the fire area. (EA, FS-BAR-37–38, ECF No. 32.)

4

to fell the hazard trees in place along 22 miles of a "priority loop" that receives more traffic than the other affected NFS roads. (Wood Decl. Ex. A. at 22, ECF No. 60-1.) Most of the work under that contract was focused on 6.4 segmented miles of road that received high burn severity and consequently had lots of hazard trees. (Wood Decl. Ex. A. at 22, ECF No. 60-1.) On September 22, 2016, a portion of that contract was awarded to Pacific Ridgeline Forestry, LLC ("Pacific Ridgeline"). (Wood Decl. Ex. A. at 5, ECF No. 60-1.) Pacific Ridgeline will fell hazard trees along roughly 4.8 miles of the priority loop. (Wood Decl. Ex. A. at 5, ECF No. 60-1.) The trees will not be salvage logged; they will simply be felled away from the road and left in place. (Wood Decl. Ex. A. at 27, ECF No. 60-1.)

Plaintiff brought this lawsuit in September 2013, shortly after the Bagley Project was first approved. (Compl., ECF No. 1) Plaintiff alleges that the Bagley Project was approved in violation of NEPA, the ESA, the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1601 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. (Compl. ¶¶ 67–111, ECF No. 1.) When Plaintiff learned that Pacific Ridgeline would begin limited felling operations in the fire area, it brought this motion seeking a temporary restraining order and/or preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure and Local Rule 231. (Notice of Mot. 1, ECF No. 50.) Plaintiff requests an injunction to halt logging along all Maintenance Level 2 roads in the fire area, except those roads for which the Forest Service has a maintenance cost-share obligation. (Mot. 2, ECF No. 50-2; Pl.'s Reply ("Reply") 2–3, ECF No. 63.)

II.   **LEGAL STANDARD**

The same legal standard applies to both preliminary injunctions and temporary restraining orders. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co*., 240 F.3d 832, 839 n. 7 (9th Cir. 2001), *overruled on other grounds*, *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7 (2008). Preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter,* 555 U.S. at 22 (citing *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (per curiam)).

Plaintiff must show four things to receive a preliminary injunction or temporary

1  restraining order. *Winter*, 555 U.S. at 20. First, Plaintiff must show that it is likely to suffer
2  irreparable harm in the absence of preliminary relief. *Id.* Second, Plaintiff must show that it is
3  likely to succeed on the merits. *Id.* Third, Plaintiff must show that the balance of equities tips in
4  its favor. *Id.* Finally, Plaintiff must show that an injunction is in the public interest. *Id.* Plaintiff
5  must "make a showing on all four prongs" of *Winter* to obtain a preliminary injunction. *Alliance*
6  *for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1135 (9th Cir. 2011). In the Ninth Circuit, courts
7  apply a sliding-scale approach. *Id.* Under this approach, a preliminary injunction may issue
8  where the plaintiff has raised "serious questions on the merits"—rather than a more complete
9  showing that it is likely to succeed on the merits—so long as the balance of hardships tips sharply
10 in the plaintiff's favor and the plaintiff satisfies the other two *Winter* prongs. *Id.*

**III.    DISCUSSION**

At the outset, the Court must clarify a basic point about the basis for the instant Order. According to Plaintiff, the now-circumscribed nature of the ongoing hazard tree felling operations is not relevant to the Court's decision on this motion. (Reply 1–2, ECF No. 63.) That argument misunderstands the nature of a preliminary injunction. True, it is a fundamental rule of administrative law that a reviewing court weighs the propriety of an agency action solely on the grounds invoked by the agency. *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943). Thus, the merits questions in this case—whether Defendants violated NEPA and the ESA—must be resolved solely by reference to the original project documents from 2013. *See Chenery*, 318 U.S. at 87–88. *See also Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985) ("The task of the reviewing court is to apply the appropriate APA standard of review . . . to the agency decision based on the record the agency presents to the reviewing court."). But the relief Plaintiff now seeks is a temporary restraining order or preliminary injunction. That "extraordinary remedy" will only issue if irreparable injury is likely to occur absent an injunction. *Winter*, 555 U.S. at 22. The Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987)). Those equitable considerations necessarily require the Court to account for the situation that is

actually occurring—namely, limited felling operations along a segment of the priority loop rather than full-scale implementation of the Bagley Project as it was originally approved.

With that consideration in mind, the Court now turns to Plaintiff's motion. Because the Court concludes that a preliminary injunction would not be warranted even if Plaintiff had shown a likelihood of success on the merits, the Court does not address that factor. *See Winter*, 555 U.S. at 23–24 (not reaching the merits because the irreparable injury, balance of equities, and public interest factors all weighed against an injunction).

A. Likelihood of Irreparable Harm

Plaintiff may not obtain a preliminary injunction unless it can show that irreparable harm is likely to result if the injunction does not issue. *Winter*, 555 U.S. at 22; *Alliance for the Wild Rockies*, 632 F.3d at 1135. Plaintiff identifies four harms that it claims are irreparable. (Mot. 6–8, ECF No. 50-2.) The Court concludes that none of Plaintiff's identified irreparable harms are likely to occur in the absence of a preliminary injunction.

First, Plaintiff argues that the logging of old growth trees is an irreparable injury. (Mot. 6, ECF No. 50-2 (citing *Lands Council v. Martin*, 479 F.3d 636, 643 (2007).) As Plaintiff points out, the Bagley Project does not impose an upward diameter on the trees and snags to be salvage logged, so it is possible that old growth trees would be felled and removed. (Mot. 6, ECF No. 50-2.) For example, when the Environmental Assessment describes the conifer trees that will be salvage logged under the Project, it identifies those trees that are "generally greater than or equal to 16-inches diameter at breast height (dbh)," but does not impose an upward limitation. (EA, FS-BAR-45, ECF No. 32.) But for now there is no indication that old growth trees will be logged in the absence of an injunction. Logging and felling are terms of art in forestry. Logging means "[t]he felling, skidding, on-site processing, and loading of trees or logs on to trucks" and is synonymous with harvesting. *Logging*, THE SOC'Y OF AM. FORESTERS, THE DICTIONARY OF FORESTRY (John A. Helms ed. 1998) (original emphasis omitted). Felling, on the other hand, is simply the "cutting down of trees" irrespective of whether the trees are ultimately removed. *Felling*, THE SOC'Y OF AM. FORESTERS, THE DICTIONARY OF FORESTRY (John A. Helms ed. 1998). Logging would have occurred under the original Bagley Project, but the ongoing hazard

1  tree abatement calls only for felling.  (Wood Decl. Ex. A at 22, ECF No. 60-1 ("It is the intent of
2  this contract to secure services for chainsaw felling of roadside hazard trees that were fire-killed
3  in the 2012 Bagley Complex.").)  *Lands Council* is thus distinguishable because it involved a
4  post-fire timber sale and actual logging, rather than roadside felling.  *Lands Council*, 479 F.3d at
5  638–39.  In any event, *Lands Council* is distinguishable for another reason: that case involved a
6  proposed post-fire timber sale that would log dying *but not yet dead* trees even though the
7  applicable NFMA Forest Plan prohibited the logging of "live trees [greater than or equal to]
8  21[inches] dbh."  *Id.* at 641.  In the instant case, "virtually all of the hazard trees [to be felled] are
9  *entirely fire killed*."  (Hamilton Decl. ¶ 17, ECF No. 57 (emphasis added).)  The contract for the
10 ongoing felling operations indicates that there are roughly 75 hazard trees per acre, approximately
11 25 of which are greater than or equal to 16 inches dbh.  (Wood Decl. Ex. A at 22, ECF No. 60-1.)
12 Plaintiff must show that an irreparable injury is *likely* in the absence of a preliminary injunction.
13 *Winter*, 555 U.S. at 22.  Plaintiff has not demonstrated that live, old-growth trees of the kind at
14 issue in *Lands Council* will be affected by the ongoing felling.

15        Second, Plaintiff argues that its members will be irreparably harmed by the Bagley Project
16 because they will be unable to view the project area in a natural post-fire state.  (Mot. 7, ECF No.
17 50-2 (citing *Alliance for the Wild Rockies*, 632 F.3d at 1135).)  But the project area is currently
18 subject to a closure order and violators may face fines or imprisonment.  *See* FS Bagley Closure
19 Order, *supra*.  Defendants represent that the closure order will remain in place until the hazard
20 trees are felled.  (Opp'n 12:5, ECF No. 56.)  Legally speaking, Plaintiff's members already find
21 themselves in the position of the *Alliance for the Wild Rockies* plaintiffs—unable to "view
22 experience and utilize" the project area in any state because of the closure order.  *Alliance for the*
23 *Wild Rockies*, 632 F.3d at 1135.  The ongoing felling operations aim to restore safety and obviate
24 the need for the closure order, which would allow Plaintiff's members to return to the area—most
25 of it unaffected—lawfully.[4]

26        Third, Plaintiff argues that the Bagley Project will intrude upon three special land

---

[4]  *Alliance for the Wild Rockies* can be read to suggest a *de minimus* exception to the type of irreparable harm that Plaintiff alleges its members are suffering, 632 F.3d at 1135, but the Court does not rely on that concept in concluding that Plaintiff will not be irreparably harmed by the ongoing felling operations.

1    management designations that provide support and refuge for the northern spotted owl. (Mot. 8,
2    ECF No. 50-2.) According to Plaintiff, the northern spotted owl will not use a stand of trees once
3    it has been burned and logged. (Mot. 8, ECF No. 50-2.) As discussed above, there is no risk of
4    any imminent logging because the ongoing hazard tree abatement work only involves felling.
5    (Wood Decl. Ex. A at 22, ECF No. 60-1.) Moreover, the relationship between the northern
6    spotted owl and tree stands that have been very severely burned is more nuanced than Plaintiff
7    suggests. According to the *Revised Recovery Plan for the Northern Spotted Owl*, "spotted owls
8    can make use of some post-fire landscapes, [but] fire also reduces the function of some habitat
9    and likely removes some from immediate usability, particularly in areas of high-severity fire."
10   (Recovery Plan, FS-BAR-4268, ECF No. 32.) The ongoing felling operations are essentially
11   confined to high-severity burn areas. (Wood Decl. Ex. A at 22, ECF No. 60-1.) Felling is also
12   subject to limited operating periods (LOPs) that account for the northern spotted owl. (Wood
13   Decl. Ex. A at 28, ECF No. 60-1.) Even the original Bagley Project imposed restrictions to leave
14   the northern spotted owl undisturbed:

> The LOPs included in the Integrated Design Features minimize direct effects to the spotted owl by avoiding disturbances during critical periods of the breeding season or when young owls are not mobile enough to readily move from a disturbance.
>
> The Bagley Project would not create any new openings as temporary storage of logs will be restricted to existing landings and the road prism.

20   (EA, FS-BAR-78, ECF No. 32.) In short, Plaintiff alleges that the Bagley Project will cause
21   northern spotted owls to leave the area and never return. At this juncture, that risk appears highly
22   speculative and, at a minimum, it does not appear likely to occur in the absence of a preliminary
23   injunction. *Winter*, 555 U.S. at 22.
24        Finally, Plaintiff argues that it is currently suffering irreparable harm because the Forest
25   Service did not properly comply with NEPA. (Mot. 8, ECF No. 50-2.) Plaintiff relies on *High*
26   *Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630 (9th Cir. 2004), for the proposition that
27   "irreparable injury flows from the failure to evaluate the environmental impact of a major federal
28   action." (Mot. 8, ECF No. 50-2 (quoting *High Sierra Hikers*, 390 F.3d at 642).) That

presumption was effectively overruled by the Supreme Court in two recent NEPA cases: *Winter* and *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010). In *Winter*, the Supreme Court made clear that, even in NEPA cases, "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). In *Monsanto*, the Supreme Court faced a question about a permanent rather than a preliminary injunction in the context of NEPA. There, the Supreme Court again reinforced that an injunction should issue only if the traditional four-factor test is satisfied. *Monsanto*, 561 U.S. at 157. Nothing in NEPA allows a court considering an injunction to put a "thumb on the scales." *Id. See also Cottonwood Environmental Law Center v. U.S. Forest Serv.*, 789 F.3d 1075, 1089 (9th Cir. 2015) (recognizing *Winter* and *Monsanto* as overruling the more lenient standard for an injunction in NEPA cases). A NEPA violation, without more, does not establish the requisite likelihood of irreparable harm.

### B. Balance of Hardships

Even if Plaintiff had raised serious questions on the merits, the Court finds that the balance of equities and the public interest both weigh against an injunction here. The Court must consider the "effect on each party of the granting or withholding of the requested relief." *Amoco Prod.*, 480 U.S. at 542. Although cases presenting a likelihood of environmental injury often involve a hardship balance that tips in favor of an injunction, the Court may not abandon the balance of harms analysis just because a potential exists for environmental injury. "Injunctive relief is an equitable remedy, requiring the court to engage in the traditional balance of harms analysis, even in the context of environmental litigation." *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1496 (9th Cir. 1995) *abrogated on other grounds by Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011).

In the instant case, the balancing act comes down to environmental injury versus safety concerns.[5] The Court finds that the safety risks posed by hazard trees along the NFS roads

---

[5] In its opposition, the Forest Service argued that the ongoing felling operations are necessary to fulfill road maintenance obligations that the Forest Service shares with private landowners. (Opp'n 16:17–23, ECF No. 56.) In response, Plaintiff modified its proposed injunction to exclude any roads for which the Forest Service has a cost-share obligation, effectively mooting the argument. (Reply 4–6, ECF No. 63.)

10

outweigh the potential for environmental harm, particularly because the ongoing felling operations are so circumscribed in scope compared to the original Bagley Project. There are currently thousands of hazard trees along the priority loop NFS roads. (Hamilton Decl. ¶ 15, ECF No. 57.) By their very definition, these hazard trees pose a risk of falling and striking the road, ultimately causing property damage or personal injury. (*Hazard Tree Guidelines for Forest Service Facilities and Roads in the Pacific Southwest Region*, EA Appendix H, FS-BAR-228, ECF No. 32.) In spite of that risk, and the closure order, many public and private workers must use the roads. (Hamilton Decl. ¶ 9, ECF No. 57.)

Plaintiff tries to sidestep the safety issue in two ways. First, Plaintiff argues that any trees that once posed a threat of falling have either fallen already or no longer pose a threat because the Bagley Fire occurred four years ago. (Mot. 10, ECF No. 50-2.) Plaintiff submits declarations from Denise Boggs, the executive director of Conservation Congress, in which Ms. Boggs avers that "there certainly is not an emergency in my opinion" and "[i]n my opinion, the trees marked for cut meeting this criteria were not hazard trees that would fall on the road." (Boggs Decl. ¶ 16, ECF No. 51; Boggs Decl. ¶ 6, ECF No. 55.) Whatever weight Ms. Boggs' opinions may have, they are undermined by the following empirical data: as of July 29, 2016, approximately 166 trees had fallen across the priority loop alone, and two new trees fell between the first and second weeks of October 2016. (Hamilton Decl. Ex. C, ECF No. 57-3; Hamilton Decl. ¶¶ 15–16, ECF No. 57.)

Second, Plaintiff argues that any safety concerns are obviated by the narrow nature of the injunction Plaintiff requests. (Mot. 10, ECF No. 50-2.) Plaintiff seeks a "narrowly tailored" injunction that will halt any felling or cutting along all Maintenance Level 2 roads, except those roads for which the Forest Service has a cost-share obligation. (Mot 2, ECF No. 50-2; Reply 5–6, ECF No. 63.) Although this request appears narrowly tailored at first blush, its narrowness is ultimately illusory. The vast majority of the NFS roads in the project area are Maintenance Level 2, and *the entire priority loop* is Maintenance Level 2. (EA, FS-BAR-174, ECF No. 32; Hamilton Decl. ¶ 11, ECF No. 57.) Plaintiff initially sought to enjoin all felling along Maintenance Level 2 roads, which would have the practical effect of halting all ongoing hazard

11

tree abatement. (Mot. 2, ECF No. 50-2.) In its reply brief, Plaintiff further narrowed its request for injunctive relief to exclude from its proposed injunction the 40 miles of roads for which the Forest Service has cost-share obligations. (Reply 5–6, ECF No. 63.) But the parties did not provide the Court with any information about whether the cost-share roads and the priority loop roads are in fact the same roads. If they are the same roads, the proposed injunction will do nothing because it will not apply to the only places where felling is actually occurring. If they are not the same roads, Plaintiff's narrower proposal offers an empty concession. In either case, the "narrowly tailored" nature of Plaintiff's proposed injunction cannot alleviate the safety concerns posed by hazard trees along the priority loop roads.

Weighing against those safety concerns is the potential for environmental injury. However, the threat of environmental injury is very limited in the instant case. Ongoing felling operations are limited to roughly 4.8 miles of the priority loop, and the felled trees will not be removed. (Wood Decl. Ex. A. at 5, 27, ECF No. 60-1.) Indeed, as discussed in § III.A, the Court concludes that Plaintiff has not shown a likelihood of irreparable environmental harm in the absence of an injunction. Although many hazard trees will be felled, that without more is not a sufficient environmental injury to outweigh the safety risk those same hazard trees pose. *See Earth Island Inst. v. Carlton*, 626 F.3d 462, 475–76 (9th Cir. 2010) (affirming the denial of a preliminary injunction based on the district court's weighing of the dangers posed by hazard trees). To be clear, the Court holds that the safety risk posed by the hazard trees outweighs any environmental injury that is actually occurring as part of the ongoing felling operations. The Court expresses no opinion on how this analysis would change if the Forest Service sought to go forward with the Bagley Project as it was originally conceived.

C. Public Interest

Finally, Plaintiff must also show that an injunction is in the public interest. *Winter*, 555 U.S. at 20. The Court finds that a preliminary injunction here would not be in the public interest, and may actually harm the public interest. The NFS roads in the fire area are currently closed because of the risk posed by the hazard trees. *See* FS Bagley Closure Order, *supra*. Nevertheless, the public faces some of the same safety threats that other road users face. As Ms. Boggs'

declaration illustrates, at least some members of the public travel through the fire area despite the closure order, even if unwittingly. (Boggs Decl. ¶¶ 8, 9, ECF No. 51.) Ms. Boggs avers that she has never seen signs or barriers indicating that the fire area was closed to recreational users. (Boggs Decl. ¶ 8, ECF No. 64.) Other members of the public, many of whom will invariably have less experience with Forest Service road closures, may also find themselves in the closed area—unaware that the area is closed because of the risks posed by hazard trees. Their safety also weighs against a preliminary injunction. *See Earth Island Inst.*, 626 F.3d at 475–76. In addition, many would-be users of public lands in the fire area, who *are* aware that the area is closed, are currently unable to visit or recreate in the fire area.

Plaintiff, relying on *Seattle Audubon Soc'y. v. Evans*, 771 F. Supp. 1081 (W.D. Wash. 1991), argues that the "public's interest in ensuring that federal agencies manage public lands in compliance with environmental laws 'invokes a public interest of the highest order: the interest in having government officials act in accordance with the law.'" (Mot. 11, ECF No. 50-2 (quoting *Seattle Audubon Soc'y*, 771 F. Supp. At 1096).) The Court agrees that the public has a strong interest in ensuring that government officials act in accordance with the law. But the Court concludes that the public's interest in holding government officials accountable does not justify a preliminary injunction in the instant case for three reasons. First, *Winter* belies the argument that a statutory violation by the federal government, by its nature, creates an overriding public interest justifying a preliminary injunction. Each factor of the four-factor test must be satisfied before a preliminary injunction will issue. *Winter*, 555 U.S. at 20. Second, Plaintiff's reliance on *Seattle Audubon Soc'y* is unpersuasive in the instant case. *Seattle Audubon Soc'y* involved a sweeping abdication of responsibility by high-level government officials. *Seattle Audubon Soc'y*, 771 F. Supp. at 1090 ("More is involved here than a simple failure by an agency to comply with its governing statute. The most recent violation of NFMA exemplifies a deliberate and systematic refusal by the Forest Service and the FWS to comply with the laws protecting wildlife. This is not the doing of the scientists, foresters, rangers, and others at the working levels of these agencies."). Morever, *Seattle Audubon Soc'y* concerned a permanent injunction after the court had granted summary judgment in the plaintiffs' favor on their NFMA claims, not, as here, a request for a

preliminary injunction where the resolution of the merits remains uncertain. *Seattle Audubon Soc'y*, 771 F. Supp. at 1082–83. Finally, the Court finds that the public interest in returning safe, lawful access to public lands simply outweighs any other interest alleged in the instant case and supports the argument against a preliminary injunction.

### IV. CONCLUSION

The narrow nature of the ongoing felling operations along the priority loop is fatal to Plaintiff's motion for a preliminary injunction. In the face of a project so focused on alleviating the worst safety risks posed by hazard trees along the most frequented NFS roads, Plaintiff has not shown that it is entitled to the "extraordinary remedy" of a preliminary injunction. *Winter,* 555 U.S. at 22. The Court makes clear that this Order depends on the narrow scope of the hazard tree felling that is actually occurring in the Bagley fire area. For the reasons discussed above, Plaintiff's motion for a temporary restraining order and/or preliminary injunction is hereby DENIED.

Dated: November 2, 2016

Troy L. Nunley
United States District Judge