1

2

3

4

5

6

7

8            UNITED STATES DISTRICT COURT

9            EASTERN DISTRICT OF CALIFORNIA

10

11   CONSERVATION CONGRESS,              No.  2:13-cv-01922-TLN-DMC

12            Plaintiff,

13       v.                              **MEMORANDUM AND ORDER
                                         GRANTING DEFENDANTS' CROSS
14   UNITED STATES FOREST SERVICE, *et*  MOTION FOR SUMMARY JUDGMENT
     *al.*,                              AND DENYING PLAINTIFF'S AMENDED
15                                       MOTION FOR SUMMARY JUDGMENT**
              Defendants.

16

17

18       This matter is before the Court pursuant to Plaintiff Conservation Congress's ("Plaintiff")

19   Amended Motion for Summary Judgment (ECF No. 76), and Defendants United States Forest

20   Service and United States Fish and Wildlife Service's ("Defendants") Cross Motion for Summary

21   Judgment (ECF No. 79).  For the reasons set forth below, the Court GRANTS Defendants' cross

22   motion for summary judgment (ECF No. 79) and DENIES Plaintiff's amended motion for

23   summary judgment (ECF No. 76).

24       **I.    STATUTORY BACKGROUND**

25       A. National Environmental Policy Act

26       The National Environmental Policy Act (hereinafter "NEPA") "is a purely procedural

27   statute." *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1070 (9th Cir. 2002).

28   NEPA does not dictate particular results or require that agencies elevate environmental impacts

1

over other concerns.  Instead, NEPA provides a process to ensure that agencies take a "hard look" at the environmental consequences of their actions.  *Id.*  NEPA serves the dual purpose of informing agency decision-makers of the environmental effects of proposed federal actions and ensuring that relevant information is made available to the public.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

As part of the required "hard look," NEPA and its implementing regulations require federal agencies to prepare a "detailed statement" concerning "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  The statement must consider the impact of the proposed action, any adverse environmental effects, alternatives to the proposed action, the relationship between short-term uses and the "maintenance and enhancement of long-term productivity," and any irreversible commitments of resources which would result from implementing the action.  *Id.*  This statement may take the form of an environmental assessment (hereinafter "EA"), or a more thorough environmental impact statement (hereinafter "EIS"), which includes a longer public comment period.  40 C.F.R. §§ 1508.9, 1508.11.

In determining whether to prepare an EIS, the agency shall determine: (1) whether the proposed project normally requires an EIS; or (2) if the project is categorically excluded from the preparation of both an EA and an EIS because the action does not individually or cumulatively have a significant effect on the human environment.  *Id.* §§ 1501.4, 1508.4.  In making this determination, absent a categorical exclusion of an EA and an EIS, the agency shall prepare an EA to determine whether an additional EIS is needed.  *Id.* § 1501.4(c).  An EA "[s]hall include brief discussions of the need for the proposal, of alternatives as required by [NEPA] section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted."  *Id.* § 1508.9(b).  If the agency concludes based on the EA that no additional EIS is required, the agency must prepare a "finding of no significant impact" ("FONSI").  *Id.* § 1501.4(e).

The agency must also consider the "cumulative impact" of a proposed project, which the federal regulations define as the result of "the incremental impact of the action when added to

2

other past, present, and reasonably foreseeable future actions . . ." *Id.* § 1508.7. Cumulative impacts may result from "individually minor but collectively significant actions taking place over a period of time." *Id.* In determining whether a project will have a "significant" impact on the environment, an agency must consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." *Id.* § 1508.27(b)(7); *see Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998).

B. Administrative Procedure Act

Agency compliance with NEPA is reviewed under the Administrative Procedure Act (hereinafter "APA"). 5 U.S.C. §§ 701–06; *Grand Canyon Trust v. U.S. Bureau of Reclamation*, 691 F.3d 1008, 1016 (9th Cir. 2012). Review is generally limited to the administrative record that was before the agency at the time of its decision. *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996). A court may set aside an agency action only if it determines that the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard of review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (quotation and citation omitted).

Courts must uphold a reasonable agency action "even if the administrative record contains evidence for and against its decision." *Modesto Irrigation Dist. v. Gutierrez*, 619 F.3d 1024, 1036 (9th Cir. 2010) (quotation and citation omitted). "The court's task is not to make its own judgment," because "Congress has delegated that responsibility to the [agency]." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010). Instead, "[t]he court's responsibility is narrower: to determine whether the [agency's action] comports with the requirements of the APA. . . ." *Id.* The Ninth Circuit has held that "[t]he [agency's] action . . . need only be a reasonable, not the best or most reasonable, decision." *Id.* (quotation and citations omitted).

The APA does not allow a reviewing court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts. *Id.*

3

This is especially true in the context of management of Forest Service lands, because Congress has consistently acknowledged that the Forest Service must balance competing demands in managing National Forest System lands.  *See United States v. New Mexico*, 438 U.S. 696, 716 n.23 (1978).

C.  Endangered Species Act

The purpose of the Endangered Species Act (hereinafter "ESA") is to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered and threatened species. . . ."  16 U.S.C. § 1531(b).  Section 7(a)(2) of the ESA requires that each federal agency must "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of the designated critical habitat of the listed species.  *Id.* § 1536(a)(2).

Accordingly, Section 7(a)(2) and its implementing regulations set out a consultation process for determining the impacts of the proposed agency action.  *See* 50 C.F.R. § 402.02.  First, the agency contemplating the action must request information from the appropriate federal wildlife service regarding "whether any species which is listed or proposed to be listed may be present in the area of such proposed action."  16 U.S.C. § 1536(c)(1).  If the agency determines that the listed species may be present in the affected area, the agency preparing to act must produce a Biological Assessment (hereinafter "BA") in accordance with NEPA "for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action."  *Id.*

D.  National Forest Management Act ("NFMA")

The National Forest Management Act (hereinafter "NFMA") requires the Forest Service to create a comprehensive management plan for each national forest, and prohibits any site-specific activities that are inconsistent with the applicable plan.  *See* 16 U.S.C. §§ 1604(a) and (e); *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 757 (9th Cir. 1996).

///

## II.    FACTUAL AND PROCEDURAL BACKGROUND

On September 16, 2013, Plaintiff filed a complaint for declaratory and injunctive relief. (ECF No. 1.)  Plaintiff brings six causes of action alleging Defendants violated NEPA, the NFMA, the APA, and the ESA when they approved the Bagley Hazard Tree Abatement Project (hereinafter "the Project").  (ECF No. 1.)  The Project was put in place in response to the August 2012, Bagley Fire in the Shasta-Trinity National Forest (hereinafter "Forest").  (ECF No. 79-3 at 3, 5.)  Roughly 46,000 acres burned, with some areas lightly burned and other areas more severely burned.  (ECF No. 79-3 at 3.)  Approximately 30% of the burned land was privately owned and 70% was publicly owned.  (ECF No. 79-3 at 3.)

The Shasta-Trinity National Forest administers land within the Bagley Fire footprint.  (EA at 1[1].)  Ninety-five miles of road within this area experienced variable degrees of fire severity and associated tree mortality.  (EA at 1.)  Fire-killed snags and defective trees damaged by the fire pose a danger to those traversing the roads within the area.[2]  (EA at 1.)  These weakened trees remain standing for a relatively short time period before falling.  (EA at 1.)  Defendant Forest Service closed almost all the roads in the fire area immediately after the Bagley Fire.  (Forest Service Closure Order 14-12-02, Shasta-Trinity National Forest Bagley Fire Emergency Closure (U.S.D.A. 2012), https://www.fs.usda.gov/detailfull/stnf/alerts-notices/ ?cid=stelprdb5443633&width=full (hereinafter "Bagley Closure Order").)  However, service personnel and fire fighters continue to access the roads to perform their jobs.  (Bagley Closure Order.)  Private landowners with easements continue to access their inholdings within the fire area.  (Bagley Closure Order.)  These individuals are exempt from the closure and continue to use the roads despite the hazards.  (Bagley Closure Order.)

Defendant Forest Service devised the Project to increase the safe use of the National Forest Transportation System within the area burned by the Bagley Fire.  (EA at 1; 36 C.F.R. § 212.6.)  The Project has three objectives: (1) retain open roads on the forest transportation system that will be needed for future activities such as forest health projects, timber management, fire

---

[1]    The EA is found on pages 20–253 of the Administrative Record (hereinafter "AR").

[2]    A falling snag and associated debris within the Bagley Fire perimeter resulted in at least one substantial injury including lacerations and broken bones, and major vehicle damage in 2012.  (EA at 1.)

protection, recreational use and management, and wildlife management; (2) meet contractual and legal obligations including cost-share agreements under the Forest Road and Trail Act Easements[3]; and (3) quickly recover the monetary value of wood through salvage and sale, where feasible and appropriate, to offset the cost to the public while reducing excessive fuel loading. (EA at 2.)  To meet those objectives, Defendant Forest Service proposed three tasks: (1) identify and fell hazard trees along 95 miles of open National Forest Service roads that have lost their structural integrity and are likely to fall uncontrolled, jeopardizing public safety and the transportation system (5,430 acres); (2) salvage higher concentrations of felled trees along nineteen segmented miles of National Forest Service roads (776 acres)[4]; and (3) treat[5] activity-created fuels in excess of ten tons per acre (woody material less than or equal to nine inches in diameter).  (EA at 9–10.)

In March 2013, Defendant Forest Service began the regulatory process under NEPA and the ESA in an effort to authorize the Project.  (ECF No. 79-3 ¶ 2.)  In June 2013, Defendant Forest Service requested public comment, and in July 2013 Defendant Forest Service issued a Draft EA.  (ECF No. 79-3 ¶ 2.)  On July 18, 2013, the Forest Service Chief granted an Emergency Situation Determination (hereinafter "ESD"), allowing implementation of the sale of timber to begin immediately following public notice of the decision.  (ESD, AR at 8784.)  Defendant Forest Service advertised the available timber, but did not receive any interested parties between 2013 and 2016.  (ECF No. 79-1 at 9.)  Defendant Forest Service issued a BA on July 22, 2013, and in response Defendant Fish and Wildlife Service issued a Concurrence Letter[6] on August 23, 2013. (ECF No. 79-3 ¶ 2.)  On August 2, 2013, Plaintiff submitted comments on the Draft EA.  (ECF No. 79-3 ¶ 2.)  On August 29, 2013, Defendant Forest Service issued a Decision Notice and Finding of No Significant Impact (hereinafter "DN/FONSI").  (ECF No. 79-3 ¶ 2.)

---

[3]     Defendant Forest Service is legally obligated to contribute funds toward maintenance or repair of the transportation system as mandated under the Forest Road and Trail Act of 1964.  (EA at 2.)

[4]     Segments of roads proposed for salvage are included within the 95 miles of road proposed for hazard tree abatement and are not in addition to the 95 miles of hazard tree abatement along roads.  (EA at 9 n.12.)

[5]     Treatment of fuels may include mastication, chipping, lop and scatter, pile and burn, and burning of concentrations.  (EA at 9 n.12.)

[6]     A concurrence letter provides independent review by an agency with particularized knowledge of the potential for adverse effects to a listed species.  16 U.S.C. § 1536.

On September 16, 2013, Plaintiff filed a complaint, alleging the Project posed a threat to the Northern Spotted Owl (hereinafter "NSO") and its habitat. (ECF No. 1.) The NSO is listed as threatened under the ESA. (EA at 43.) Surveys from the 1990s, 2011, and 2012 revealed at least one NSO activity center within the Project area. (EA at 44–45.) Results of post-fire surveys were not available at the time the EA was finalized. (EA at 45.)

Defendants brought a motion to dismiss, alleging Plaintiff's claims were barred because Plaintiff failed to exhaust available and statutorily-mandated administrative remedies (ECF No. 15-1 at 1), which the Court denied (ECF No. 25). The Court determined Plaintiff's claims were not barred because the ESD allowed the logging project to be implemented immediately, depriving Plaintiff of the opportunity to appeal. (ECF No. 25 at 8; ESD, AR at 8784.) Plaintiff filed a motion for a temporary restraining order (ECF No. 50), which the Court also denied (ECF No. 66).

On November 21, 2016, Plaintiff filed a motion for summary judgment. (EFC No. 70.) On January 6, 2017, Defendants filed a cross motion for summary judgment. (EFC No. 79.) The Court has carefully considered the arguments raised by both parties' briefing. For the reasons stated below, Plaintiff's motion for summary judgment is DENIED. Defendants' motion for summary judgment is GRANTED.

**III.     STANDARD OF LAW**

Summary judgment is appropriate when the moving party demonstrates no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at

324 (internal quotations omitted).  Indeed, summary judgment should be entered against a party who does not make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(c).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.* at 251–52.

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *First Nat'l Bank*, 391 U.S. at 288–89.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  *Matsushita*, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with any applicable affidavits.  Fed. R. Civ. P. 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir. 1982).  The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts pleaded before the court must be drawn in favor of the opposing party.  *Anderson*, 477 U.S. at 255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  *Richards v.*

8

*Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987). Finally, to demonstrate a genuine issue that necessitates a jury trial, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 587.

## IV. ANALYSIS

Plaintiff makes two primary arguments in its motion for summary judgment: (1) Defendant Forest Service violated NEPA; and (2) Defendants violated the ESA. (ECF No. 77.) The motion for summary judgment includes four claims: (1) Defendant Forest Service failed to disclose or analyze the cumulative effects of the Project in combination with private lands logging, as required by NEPA (ECF No. 77 at 10); (2) under NEPA, Defendant Forest Service was required to prepare an EIS because the environmental effects of the Project may be significant (ECF No. 77 at 20); (3) Defendant Forest Service failed to consider a reasonable range of alternatives, as required by NEPA (ECF No. 77 at 28); and (4) Defendant Fish and Wildlife Service issued an arbitrary and capricious concurrence letter in violation of the ESA (ECF No. 77 at 29).

In response, Defendants filed a cross motion for summary judgment. (ECF No. 79.) Defendants raised five arguments in the cross motion for summary judgment: (1) Defendants considered the effects of private salvage operations, satisfying NEPA's requirement to consider cumulative impacts (ECF No. 79-1 at 12); (2) the environmental effects of the Project are minimal so an EIS was not required under NEPA (ECF No. 79-1 at 23); (3) Defendant Forest Service considered a reasonable range of alternatives to the Project, as required by NEPA (ECF No. 79-1 at 29); (4) Defendant Fish and Wildlife Service's concurrence letter considered the best available science, as required by the ESA (ECF No. 79-1 at 31); and (5) no injunction can be issued because Plaintiff has failed to meet its burden to demonstrate an injunction is required (ECF No. 79-1 at 37).[7] The Court will first address the NEPA claims, then address the ESA

---

[7] Because the Court finds for Defendants on the first four claims, the Court declines to address Defendants' fifth claim.

1    claim. The Court will then address Defendants' argument regarding Plaintiff's NFMA claim that

2    was raised in the original complaint but not addressed by Plaintiff at summary judgment.

3          A.   Whether Defendant Forest Service adhered to the procedural requirements of NEPA

4          Plaintiff argues Defendant Forest Service violated NEPA for three reasons: (1) Defendant

5    Forest Service was required to prepare an EIS because the Project may have a significant impact

6    on the environment due to the alleged cumulative impacts of private logging projects (ECF No.

7    77 at 20); (2) Defendant Forest Service was required to prepare an EIS due to the alleged effects

8    of the Project on special land designations (ECF No. 77 at 23); and (3) Defendant Forest Service

9    failed to consider a reasonable range of alternatives (ECF No. 77 at 28).

10         Defendant Forest Service responds that the Project will not have a significant impact on

11   the environment. Specifically, Defendant Forest Service brings three arguments in its cross

12   motion for summary judgment: (1) agencies incorporated the cumulative effects of private

13   logging operations into the environmental analysis (ECF No. 79-1 at 12); (2) an EIS was not

14   required because the environmental effects of the Project are minimal (including an assertion that

15   treatment on special land designations does not mandate an EIS) (ECF 79-1 at 23); and (3)

16   Defendant Forest Service considered a reasonable range of alternatives (ECF No. 79-1 at 29).

17         The Court will address the parties' arguments in turn.

18         i.    *Whether the Project may have a significant impact on the environment due to the*

19               *alleged cumulative effects of private logging activities*

20         Plaintiff alleges an EIS was required because the Project may have a significant impact on

21   the environment due to the alleged cumulative impacts of private logging and salvage. (ECF No.

22   77 at 9–11.) Plaintiff argues Defendant Forest Service inadequately considered the cumulative

23   effects of private logging and salvage operations. (ECF No. 77 at 11.) In opposition, Defendant

24   Forest Service argues that the BA and EA considered cumulative impacts of private logging

25   activities within the analysis area. (ECF No. 79-1 at 12.) Defendant Forest Service argues that

26   only after appropriate consideration, the agency concluded the Project would not have a

27   significant impact on the environment. (ECF No. 79-1 at 12.) In Defendant Forest Service's

28   cross-motion for summary judgment, the agency argues this Court should deny relief for Plaintiff

on the basis that Defendant Forest Service considered the effects of private salvage operations. (ECF No. 79-1 at 12.)

The Ninth Circuit has held that an EIS must be prepared when "substantial questions are raised whether a project may have a significant effect upon the human environment." *Found. For N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1178 (9th Cir. 1982). An EIS need not be prepared if the effects to the human environment of a proposed action are insignificant. *See Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1009 (9th Cir. 2006). However, an EA may be deficient if it fails to include a cumulative impact analysis. *See Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1075 (9th Cir. 2002). Cumulative actions are those "which when viewed with other proposed actions have cumulatively significant impacts." 40 C.F.R. § 1508.25(a)(2). A cumulatively significant impact is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions." *Id.* § 1508.7. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. *Id.* Consideration of cumulative impacts requires "some quantified or detailed information[;] . . . [g]eneral statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Neighbors of Cuddy Mountain*, 137 F.3d at 11379–80.

In the instant case, 30% of the land burned in the Bagley Fire was private land. (EA at 1.) The Forest Service must account for any private actions taken on that land that will cumulatively affect the environment, even though the private actions are not under the Forest Service's control. *Res. Ltd. v. Robertson*, 35 F.3d 1300, 1306 (1993). Plaintiff alleges Defendant Forest Service failed to acknowledge *any* effects of private lands logging on NSO critical habitat. (ECF No. 77 at 11–13.) However, Defendant Forest Service clearly determined private land would be logged. (BA[8] at 14 ("Private land affected by a fire severity class of 2 (low-moderate) or above would be entirely salvage logged. . . . ").) Additionally, the BA assumes that private land affected by a low to moderate fire severity or above "subsequently would be unsuitable NSO habitat." (BA at 14.)

---

[8] The BA is found on pages 593-654 of the AR

11

1  Further, the BA states, "[T]his is likely a conservative approach and probably underestimates the

2  amount of NSO habitat available."  (BA at 23.)

3       Moreover, Defendant Forest Service may prove that there are not significant impacts on

4  the environment, satisfying NEPA, by aggregating the cumulative effects of past projects into an

5  environmental baseline, against which the incremental impact of a proposed project is measured.

6  *See Ecology Ctr. v. Casteneda*, 574 F.3d 652, 666–67 (9th Cir. 2009).  "An agency can take a

7  'hard look' at cumulative impacts either by individually discussing a previously approved project,

8  or incorporating the expected impact of such a project into the environmental baseline against

9  which the incremental impact of a proposed project is measured."  *Cascadia Wildlands v. Bureau*

10  *of Indian Affairs*, 801 F.3d 1105, 1112 (9th Cir. 2015).

11      Defendant Forest Service elected to incorporate the cumulative effects of private lands

12  logging to the environmental baseline.  (ECF No. 79-1 at 12.)  "[T]o the extent that 40 C.F.R. §

13  1508.7 does not explicitly provide otherwise, the Forest Service is free to consider cumulative

14  effects in the aggregate or to use any other procedure it deems appropriate."  *League of*

15  *Wilderness Defenders-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 549 F.3d 1211,

16  1218 (9th Cir. 2008).  Defendant Forest Service discussed activities on private lands and the

17  impact to NSO habitat throughout the EA.  (*See, e.g.*, EA at 10, 29, 39, 42, 57 (noting

18  "[a]dditional impacts to the [NSO] and Sensitive species . . . could occur from the disturbance

19  generated during implementation overlapping in space and time with private actions (salvage

20  logging, operating under emergency Timber Harvest Plans) in the analysis area.").)  The EA

21  implements design features to ensure anticipated environmental impacts would be minimal.  (EA

22  at 57–58.)  These design features include Limited Operating Periods[9], equipment exclusion zones,

23  restricted use of equipment, and the conservative approach to tree removal.  (EA at 57–58.)

24  NEPA does not "explicitly require individual discussion of the impacts of reasonably foreseeable

25  projects, and, absent such a requirement, it is not for the court to tell the agency how specifically

26  to present such evidence in an EA."  *Cascadia Wildlands*, 801 F.3d at 1112; *see also Citizens to*

27
---
[9]     A Limited Operating Period defines the time periods in which potentially disruptive activities will not be
28  permitted.  For example, Limiting Operating Periods are designed to avoid logging, salvaging, and burning during
     months when NSOs are roosting and breeding.  (BA at 30.)

*Preserve Overton Park, Inc. v. Volpe*, 401 US. 402, 416 (1971), *abrogated in part on other grounds as recognized in Califano v. Sanders*, 430 U.S. 99, 105 (1977) (holding that an agency's decision is entitled to "a presumption of regularity" and a court may not substitute its judgment for that of the agency).

The Court finds, based on the undisputed facts set forth in the record, that Plaintiff has not made a showing sufficient to establish the existence of a genuine dispute of material fact regarding this claim as required in order to survive summary judgment. Accordingly, the Court finds that there is no genuine dispute of material fact. Defendant's analysis of private logging impacts satisfies the procedural requirements of NEPA and is subject to judicial deference under the APA. Plaintiff's motion for summary judgment on this claim fails, and Defendant Forest Service's motion for summary judgment on this claim succeeds.

     ii.     *Whether the Project may have a significant effect on unique characteristics of the geographic area and ecologically critical areas*

Plaintiff alleges the Project will have a significant impact on three types of special land designations: (1) Inventory Roadless Areas ("IRA") (ECF No. 77 at 23), (2) Late Successional Reserves ("LSR") (ECF No. 77 at 25), and (3) NSO critical habitats (ECF No. 77 at 27). Defendant Forest Service alleges any environmental effect of the Project to special land designations would be minimal, meaning that an EIS was and is not required. (ECF No. 79-1 at 26–28.) In its cross motion for summary judgment, Defendant Forest Service alleges treatment on special land designations does not mandate an EIS. (ECF No. 79-1 at 26.)

NEPA regulations provide that the term "significantly," as used in NEPA, "requires considerations of both context and intensity." 40 C.F.R. § 1508.27. Context refers to the setting in which a proposed action takes place. *Id.* § 1508.27(a). Intensity "refers to the severity of impact" by consideration of a number of factors. *Id.* § 1508.27(b). Satisfying even one of these factors may be sufficient to necessitate preparation of an EIS. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d at 846, 865 (9th Cir. 2005). One such factor is unique characteristics of a geographic area. 40 C.F.R. § 1508.27. Plaintiff alleges the Project encompasses geographic areas with three unique characteristics: IRAs, LSRs, and NSO critical habitats. (ECF No. 77 at

23–27.)

a. Inventory Roadless Areas

First, Plaintiff argues the Project may have a significant impact on IRAs, including the impairment of the roadless characteristics of the IRAs, such as the scenery. (ECF No. 77 at 23–25.) Defendant responds by stating the EA considered the impacts of the Project on roadless characteristics and ultimately concluded the Project would enhance scenery. (ECF No. 79-1 at 28.)

IRAs, one of the three special land designations at issue, are areas designed to preserve roadless characteristics. (ECF No. 72 at 27.) The Project proposes to fell hazardous snags within the boundaries of two IRAs, the East Girard IRA and the Kettle Mountain IRA. (EA at 115.) The fact that a proposed treatment affects a special land designation does not, *per se*, require that an EIS must be prepared. *Smith v. Forest Serv.*, 33 F.3d 1072, 1078–79 (9th Cir. 1994) (finding that an agency has an obligation to take a hard look at the environmental consequences of an action, including, at the very least, acknowledging the existence of a roadless area); *Ctr. for Biological Diversity v. Gould*, 150 F. Supp. 3d 1170, 1184 (E.D. Cal 2015) (finding "the logging of a roadless area does not automatically require an EIS analysis"). However, the lead agency is required to "directly address[] why the [Project] will not impact an area with unique characteristics." *Ctr. for Biological Diversity*, 150 F. Supp. 3d at 1184.

In *Center for Biological Diversity*, a court within this district addressed potential environmental consequences of a project on future potential wilderness designation areas (an area with unique characteristics like IRAs). *Ctr. for Biological Diversity*, 150 F. Supp. 3d at 1184. The Forest Service found that the impact of the project on any future potential wilderness designations would be negligible. *Id.* The Forest Service determined that the area in question lacked the requisite wilderness character for designation, and the project would not affect an area with unique characteristics. *Id.* The court concluded that the DN/FONSI "directly addresses why the [Project] w[ould] not impact an area with unique characteristics" and was thus permissible. *Id.*

The facts here are similar. The EA describes the East Girard and Kettle Mountain IRAs as

14

"substantially roaded" and "having minor roading," concluding that the IRAs

"currently lack the characteristics generally associated with large, undisturbed areas of land."

(EA at 115.)  The EA states that 1.8% of the East Girard IRA and 0.1% of the Kettle Mountain

IRA would be affected by the proposed action.  (EA at 115.)  Based on the preexisting condition

of the IRAs and these calculations, the EA concluded the Project would have no adverse effects

on the roadless characteristics of the IRAs.  (EA at 116.)  Because Defendant Forest Service

addressed why the Project will not impact the unique characteristics of IRAs, Defendant Forest

Service has met the procedural burden of NEPA regarding IRAs.

b.  Late Successional Reserves and Critical Habitat

Plaintiff next argues that the Project will have a significant impact on the Iron Canyon

LSR[10] and NSO critical habitat.  (ECF 72 at 29–30.)  Plaintiff alleges the Iron Canyon LSR

provides crucial habitat for the NSO as well as connectivity to the Cascades and Sierra Nevada

Mountains.  (ECF No. 77 at 26–27.)  Plaintiff states Defendant Forest Service has not provided

any substantive or contextual data about extensive private lands logging within this area, as

required by NEPA's mandate to consider cumulative impacts.  (ECF No. 77 at 27–28.)

Defendant Forest Service responds by alleging the BA specifically addressed the effect of the

Project on the LSR and NSO habitat and found the environmental effects would be minimal.

(ECF No. 79-1 at 28.)

The BA determined that in a typical 40-acre section of forest that is next to a road, only

17% of the trees would be treated, and within that 17% of treated trees, 30% of the snags would

remain untouched.  (BA at 26.)  In treated areas adequate numbers of snags would remain for

NSOs to roost, nest, and perch.  (BA at 26.)  The BA states, "the [Project] impacts would not

affect the function of the habitat."  (BA at 27.)  Defendant Forest Service considered the impact

of the Project on NSO roosting, nesting, and perching activities and concluded that habitat

function would not be significantly affected by the Project.  (BA at 27.)

"[A]n agency must have discretion to rely on the reasonable opinions of its own qualified

---

[10] The Iron Canyon LSR is prescribed to be managed to protect and enhance late-successional forest ecosystems used by wildlife species such as the NSO.  (EA at 6.)

15

experts, even if, as an original matter, a court might find contrary views more persuasive." *Marsh*

*v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989). Defendant Forest Service relied on the

opinions of its own experts, and the conclusions reached by those experts are supported by

substantial evidence such that they deserve judicial deference. *See Bear Lake Watch, Inc. v.*

*FERC*, 324 F. 3d 1071, 1076 (9th Cir. 2003) (finding that where an agency has relied on "relevant

evidence [such that] a reasonable mind might accept as adequate to support a conclusion," its

decision is supported by substantial evidence).

Accordingly, based on the undisputed facts set forth in the record, Plaintiff's claim that

the Project may have a significant impact on the environment is without merit, as Defendant

Forest Service considered the cumulative impacts of private logging activities and addressed the

potential adverse environmental affects for special land designations.

       iii.     *Whether the Forest Service considered a reasonable range of alternatives to*
                    *the Bagley Timber Sale*

Plaintiff claims Defendant Forest Service failed to consider a reasonable range of

alternatives for the Project. (ECF No. 77 at 28–30.) Plaintiff alleges Defendant Forest Service

considered only near-identical alternatives to the Project, and failed to consider an alternative that

does not intrude upon designated NSO critical habitat. (ECF No. 77 at 28–30.) In their cross-

motion for summary judgment, Defendants respond that Plaintiff's claim lacks merit because the

EA considered three alternatives to the Project, and these alternatives were sufficient under

NEPA. (ECF No. 79-1 at 29–31.)

The alternatives section is the "heart" of the agency's environmental analysis, and the

agency must rigorously explore and objectively evaluate all reasonable alternatives. 40 C.F.R. §

1502.14. Courts review an EIS's range of alternatives under the "rule of reason," which states

that the EIS "need not consider an infinite range of alternatives, only reasonable or feasible ones."

*City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997) (citing

40 C.F.R. § 1502.14(a)-(c)). The choice of alternatives is "bounded by some notion of

feasibility" and an agency is not required to consider "remote and speculative" alternatives. *Vt.*

*Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978). The

"range of alternatives that must be considered in the EIS need not extend beyond those reasonably related to the purposes of the project." *Westlands Water Dist. v. U.S. Dept. of Interior*, 376 F.3d 853, 868 (9th Cir. 2004) (quoting *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 524 (9th Cir. 1994)).

The EA evaluated three alternatives: (1) No Action; (2) Proposed Action – Hazard Tree Abatement with Removal; and (3) Hazard Tree Abatement without Removal. (EA at 15–19.) The no action alternative would open roads for the public to access at their own risk, and no hazard tree abatement or removal would be implemented. (EA at 15.) The Hazard Tree Abatement with Removal option would remove hazardous trees uphill and downhill of roads, identifying trees using the 2012 *Hazard Tree Guidelines for Forest Service Facilities and Roads in the Pacific Southwest Region* (hereinafter "Hazard Tree Guidelines"). (EA at 15.) Height and distance from roads are the primary indicators for selection. (EA at 15.) Once felled, trees would either be removed or treated. (EA at 16.) The Hazard Tree Abatement without Removal would fell the same trees and snags identified in the second project option, but would leave felled material on the land rather than removing it. (EA at 18–19.) Where activity created fuels in excess of ten tons per acre, the felled material would be treated. (EA at 19.)

Plaintiff argues Defendant Forest Service failed to consider an alternative "that would not enter IRA, LSR, and/or NSO Critical Habitat." (ECF No. 77 at 29.) However, nearly all of the Project area comprises at least one of the three land designations at issue. (EA at 10.) Defendant Forest Service alleges that an alternative that did not enter land designated as IRA, LSR, or NSO critical habitat would be very similar to a no action alternative. (ECF No. 79-1 at 30.) Defendant Forest Service did consider a no action alternative but ultimately rejected this alternative due to the safety hazards that would continue to exist on the affected roads. (ECF No. 79-1 at 30.) An agency need not discuss alternatives that are similar to actually considered alternatives or that are "infeasible, ineffective, or inconsistent with the basic policy objectives" of the project. *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006). Because the underlying purpose of the Project is to remove unsafe snags and dead trees, an alternative that fails to remove the unsafe snags and trees is inconsistent and ineffective with the purpose of the Project. (EA at 1.)

17

Further, Plaintiff alleges both action alternatives enter 17% of the entire burned area. (ECF No. 77 at 29.) Plaintiff argues Defendant Forest Service could have evaluated an action alternative that enters a smaller percentage of the fire-affected area while still satisfying the purpose of and need for the Project. (ECF No. 77 at 29.) However, both action alternatives are estimated to affect 17% of the burned area affected by *high-severity* fire, which is substantially less than 17% of the entire burned area at any fire severity level. (BA at 26.) Defendant Forest Service considered reducing the distance from the road used to classify hazard trees, effectively reducing the number of acres treated. (EA at 29.) Ultimately, Defendant Forest Service elected to use the Hazard Tree Guidelines, Forest Service Health and Safety Code Handbook, and OSHA guidelines for logging operations to determine which trees pose hazards. (EA at 29.) The decision to rely on these materials and come to the minimal environmental impact conclusion is entitled to deference. *See City of Sausalito v. O'Neill*, 386 F.3d 1186, 1214–15 (9th Cir. 2004) (upholding an agency's use of "reports and letters" in considering the costs and benefits of different project alternatives); *League of Wilderness Defenders-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1071 (9th Cir. 2012) (permitting an agency to rely on data it had previously calculated when considering different alternatives); *City of Carmel-by-the-Sea*, 123 F.3d at 1159 (giving deference to an agency's reasoned decision not to pursue a plaintiff's proposed alternative after adequately considering environmental effects). Given the specific purpose and limited scope of the Project, the three alternatives contemplated by Defendant Forest Service satisfy the procedural NEPA requirement. *See Laguna Greenbelt, Inc.*, 42 F.3d at 524 ("[T]he EIS discusses in detail all the alternatives that were feasible and briefly discusses the reasons others were eliminated. This is all NEPA requires. . . .").

Accordingly, the Court finds there is no genuine dispute of material fact as to Plaintiff's claim that Defendant Forest Service failed to evaluate adequate alternatives. Plaintiff's argument that genuine issues of fact exist regarding this claim is without merit, and Defendant Forest Service's motion for summary judgment on this issue prevails.

///

///

1    B.  <u>Whether the Fish and Wildlife Service's concurrence letter is arbitrary and capricious and</u>

2        <u>satisfies the ESA requirements</u>

3        Plaintiff claims the Fish and Wildlife Service's concurrence letter is arbitrary and

4   capricious because it is not based on best available scientific and commercial data.  (EFC No. 77

5   at 29.)  Defendant Fish and Wildlife Service responds that the concurrence letter is based on best

6   available science and meets ESA requirements.  (ECF No. 79-1 at 31.)

7        Pursuant to the ESA, each consultation agency shall use the best scientific and

8   commercial data available in determining whether a project will affect a particular species or

9   habitat. 16 U.S.C. § 1536(a)(2).  Plaintiff alleges the 2011 NSO Recovery Plan ("Recovery Plan")

10  is the best available scientific data.  (ECF No. 77 at 29–30.)  Plaintiff alleges Defendant Fish and

11  Wildlife Service's failure to utilize the Recovery Plan violates the ESA requirement to use best

12  available scientific data.  (*See* ECF No. 77 at 29–33.)  The Recovery Plan states that "[i]n lands

13  where management is focused on development of [NSO] habitat, post-fire silvicultural activities

14  should concentrate on conserving and restoring habitat elements that take a long time to develop

15  (e.g., large trees, medium and large snags, downed wood)."  (Recovery Plan, AR at 4219.)

16  Recovery plans are not mandatory nor enforceable against Defendant Fish and Wildlife Service.

17  *Conservation Cong. v. Finley*, 774 F.3d 611, 620 (9th Cir. 2014) ("[D]eclining to adopt particular

18  recommendations in a recovery plan or a study—neither of which is binding on an agency—does

19  not constitute failing to consider them . . . ")  The decision about what constitutes the best

20  available science depends on the discretion of the agency.  *San Luis & Delta-Mendota Water*

21  *Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014).  "[W]hen reviewing scientific judgments and

22  technical analyses within the agency's expertise, the reviewing court must be at its most

23  deferential."  *Conservation Cong.*, 774 F.3d at 617 (citing *Conservation Cong. v. U.S. Forest*

24  *Serv.*, 720 F.3d 1048, 1054 (9th Cir. 2013) (citation and internal quotations omitted).  The Ninth

25  Circuit has held that although an agency should consider recovery plans, adopting

26  recommendations in those plans is not mandatory, and agencies can use discretion in determining

27  what constitutes the best available science.  *Conservation Cong.*, 774 F.3d at 620.

28       Judicial review of NEPA and ESA claims is conducted under the APA, which allows

courts to overturn agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2011) (quoting 5 U.S.C. § 706(2)(A)) (internal quotations omitted). This standard requires a "rational connection between facts found and conclusions made" by the defendant agencies. *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 760 (9th Cir. 2014) (citation and internal quotations omitted). In the Concurrence Letter, Defendant Fish and Wildlife Service alleges it considered the Recovery Plan as one of several pieces of information constituting best available science. (Concurrence Letter, AR at 2786.) Appendix A of the Concurrence Letter outlines the various studies used and how those studies led Defendant Fish and Wildlife Service to the conclusion of no adverse effects. (Concurrence Letter, AR at 2798.) Courts have held that if a plaintiff disagrees with the science relied on by the agency, the court must give deference to the agency who relied on their experts and took reasonable actions. *Earth Island Inst v. Bird*, No. 2:08–CV–01897 JAM–JFM, 2011 WL 4479802 at *15 (E.D. Cal. Sept. 26, 2011) ("The reviewing court's task is to 'insure a fully informed and well-considered decision, not necessarily a decision that [the court] . . . would have reached had [it] been [a] member of the decision making unit of the agency.'") (citing *Vt. Yankee Nuclear Power Corp.*, 435 U.S. at 558. *See also Marsh*, 490 U.S. at 378 (finding "an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive"). Plaintiff may disagree that Defendant Fish and Wildlife Service's Concurrence Letter is based on the best available scientific information, but the agency's determination must be given deference.

Accordingly, based on the undisputed facts set forth in the record, the Court finds that Plaintiff has not made a showing sufficient to establish the existence of a genuine dispute of material fact regarding this claim, as required in order to survive summary judgment, because Defendants must be given deference to utilize the best available science as they see fit. Defendants prevail on their motion for summary judgment.

///

///

C. Plaintiff alleged insufficient facts to support a claim under the NFMA that Defendant Forest Service failed to comply with the Forest Plan Standards & Guidelines

In the initial complaint, Plaintiff argues Defendant Forest Service failed to comply with the Forest Plan Standards & Guidelines in violation of the NFMA. (ECF No. 1 at 15.) Defendant Forest Service states in its motion for summary judgment that Plaintiff did not make any factual or legal arguments in support of this fifth cause of action. (ECF No. 79-1 at 9 n2.) Plaintiff does not argue this claim in its motion for summary judgment (*see* ECF No. 77), nor does Plaintiff respond to Defendants' arguments in Defendants' cross motion for summary judgment (*see* ECF No. 81). Defendants contend Plaintiff bears the burden of proving a violation of the NFMA. (ECF No. 79-1 at 4 n2.)

In NFMA cases, the party challenging the agency action bears the burden of proof. *Envtl. Prot. Info. Ctr. v. Blackwell*, 389 F. Supp. 2d 1174, 1220 (N.D. Cal. 2004). In its complaint, Plaintiff alleges that the Forest Service is required by the Shasta-Trinity National Forest Plan to manage threatened and endangered species under existing recovery plans. (ECF No. 1 ¶ 102.) Plaintiff has failed to establish ways in which Defendants failed to abide by the Shasta-Trinity National Forest Plan, and thus the NFMA. Because Plaintiff fails to establish facts demonstrating a failure to comply with the Forest Plan Standards & Guidelines in Plaintiff's filings, Plaintiff has failed to meet its burden. (*See* ECF No. 77; ECF No. 81.) Summary judgment should be entered against a party who does not make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 324 ("[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file.") (internal quotations omitted).

The Court finds, based on the undisputed facts set forth in the record, that Plaintiff has not made a showing sufficient to establish the existence of a genuine dispute of material fact regarding this claim as required in order to survive summary judgment. Accordingly, Defendant's motion for summary judgment on this issue is granted.

V. **CONCLUSION**

For the reasons discussed above, it is hereby **ORDERED**:

Plaintiff's Amended Motion for Summary Judgment (ECF No. 76) is DENIED. Defendants' Cross Motion for Summary Judgment (ECF No. 79) is GRANTED. Additionally, Defendants' Motion to Strike Declaration of Denise Boggs (ECF No. 80) is DENIED as MOOT, as the Court did not rely on the declaration in issuing this Order.

The Clerk of the Court shall enter judgment in Defendants' favor on all claims for relief. The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

Dated: March 27, 2019

Troy L. Nunley
United States District Judge